1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  PHILLIP E. HATCHER,[1]            ) Case No. EDCV 15-1352-JPR
                                      )
12                  Plaintiff,        )
                                      ) **MEMORANDUM DECISION AND ORDER**
13          v.                        ) **AFFIRMING COMMISSIONER**
                                      )
14  CAROLYN W. COLVIN, Acting         )
    Commissioner of Social            )
15  Security,                         )
                                      )
16                  Defendant.        )
    ─────────────────────────        )

17

18  **I.    PROCEEDINGS**

19       Plaintiff seeks review of the Commissioner's final decision

20  denying his applications for Social Security disability insurance

21  benefits ("DIB") and supplemental security income benefits

22  ("SSI").  The parties consented to the jurisdiction of the

23  undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The

24  matter is before the Court on the parties' Joint Stipulation,

25  filed June 24, 2016, which the Court has taken under submission

26

27  ─────────────────

28       [1] The documents in the Administrative Record seem to
    indicate that Plaintiff's first name is spelled with one "l."
    The Court uses the spelling on the Complaint, however.

without oral argument.   For the reasons stated below, the
Commissioner's decision is affirmed.

**II.   BACKGROUND**

Plaintiff was born in 1959.   (Administrative Record ("AR")
31.)   He obtained a GED (AR 1034) and worked as a construction
supervisor, sales assistant, auto detailer, and plumber (AR
1056).

On January 27, 2012, Plaintiff filed an application for SSI
and on January 30 he filed one for DIB, alleging in each that he
had been unable to work since October 1, 2006 (AR 99, 153),
because of two shoulder surgeries and "constant low back pain"
radiating down his legs (AR 31, 163).   After his applications
were denied initially and on reconsideration, he requested a
hearing before an Administrative Law Judge.   (AR 67.)   A hearing
was held on January 29, 2013, at which Plaintiff, who was
represented by counsel, testified, as did a vocational expert.
(AR 1030-66.)   At the hearing, Plaintiff amended his alleged
onset date to January 1, 2011.   (AR 1052.)   In a written decision
issued December 26, 2013, the ALJ found Plaintiff not disabled.
(AR 13-29.)   Plaintiff requested review from the Appeals Council,
and on May 11, 2015, it denied review.   (AR 7-10.)   This action
followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the
Commissioner's decision to deny benefits.   The ALJ's findings and
decision should be upheld if they are free of legal error and
supported by substantial evidence based on the record as a whole.
See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra

1  v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial

2  evidence means such evidence as a reasonable person might accept

3  as adequate to support a conclusion.  Richardson, 402 U.S. at

4  401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

5  It is more than a scintilla but less than a preponderance.

6  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.

7  Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether

8  substantial evidence supports a finding, the reviewing court

9  "must review the administrative record as a whole, weighing both

10 the evidence that supports and the evidence that detracts from

11 the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,

12 720 (9th Cir. 1996).  "If the evidence can reasonably support

13 either affirming or reversing," the reviewing court "may not

14 substitute its judgment" for the Commissioner's.  Id. at 720-21.

15 **IV.  THE EVALUATION OF DISABILITY**

16 People are "disabled" for purposes of receiving Social

17 Security benefits if they are unable to engage in any substantial

18 gainful activity owing to a physical or mental impairment that is

19 expected to result in death or has lasted, or is expected to

20 last, for a continuous period of at least 12 months.  42 U.S.C.

21 § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

22 1992).

23 A.  The Five-Step Evaluation Process

24 The ALJ follows a five-step sequential evaluation process to

25 assess whether a claimant is disabled.  20 C.F.R.

26 §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,

27 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first

28 step, the Commissioner must determine whether the claimant is

currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform his past work; if so, he is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2011, the alleged onset date.  (AR 19.)  At step two, he concluded that Plaintiff had severe impairments of degenerative disc disease, spondylosis,[3] degenerative joint disease, chronic pain, hypertension, and compression fracture.  (<u>Id.</u>)  At step three, he determined that Plaintiff's impairments did not meet or equal a listing.  (AR 20.)

At step four, the ALJ found that Plaintiff had the RFC to perform light work but was limited to "occasional postural activities" and "occasional overhead reaching bilaterally."  (AR 21.)  Plaintiff could never climb ladders, ropes, or scaffolds and should avoid all exposure to hazards.  (<u>Id.</u>)  He was limited to unskilled work "largely due to [his] physical impairments" and "must be allowed to have a sit/stand option every 30 minutes."  (<u>Id.</u>)  The Commissioner contends that by this the ALJ intended to limit Plaintiff to four hours of standing a day, consistent with

---

[3] Spondylosis refers generally to degeneration of the vertebrae.  <u>Stedman's Medical Dictionary</u> 1678 (27th ed. 2000).

the treating doctors' opinions.  (J. Stip. at 13.)

    Based on the VE's testimony, the ALJ concluded that Plaintiff could not perform his past relevant work.  (AR 26–27.) At step five, he relied on the VE's testimony to find that given Plaintiff's RFC for light work "impeded by additional limitations," he could perform three light, unskilled "representative occupations" in the national economy: (1) "small products assembler II," DOT 739.687-030, 1991 WL 680180; (2) "cashier II," DOT 211.462-010, 1991 WL 671840; and (3) "bench assembler," DOT 706.684-042, 1991 WL 679055.  (AR 27–28.) Accordingly, he found Plaintiff not disabled.  (AR 29.)

**V.   DISCUSSION**

    Plaintiff argues that the ALJ erred in (1) assessing his standing and reaching limitations; (2) assessing his credibility; and (3) finding that he could perform light-exertion jobs.  (See J. Stip. at 4.)

    A.   The ALJ Properly Assessed the Medical Evidence

    Plaintiff contends that the ALJ failed to properly assess the medical evidence: specifically, he erred in "rejecting" the opinions of Dr. Giorgio Roveran, Dr. Andrew Guo, and Dr. Roy Rusch by finding that he could work with a "sit/stand option every 30 minutes" and in "rejecting" the opinion of Dr. Mark Stern by finding that Plaintiff had no forward- or side-reaching limitations.  (Id. at 6-12, 22-26.)  For the reasons discussed below, remand is not warranted on this ground.

        1.   Applicable law

    Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2)

6

those who examined but did not treat the plaintiff, and (3) those who did neither.  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  Id.

This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. §§ 404.1527(c)(2), 416.927(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When a treating physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it.  Id. (citing Lester, 81 F.3d at 830-31).  Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately

7

supported by clinical findings."  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

    2.  Relevant background

        a.  *Dr. Sheralene Ng*

    Since the alleged onset date, January 1, 2011, Plaintiff had been prescribed oxycodone and acetaminophen for his pain by his primary-care doctor, Sheralene H. Ng.[4]  (AR 545.)  He was in a car accident on April 9, 2011, and was taken to the emergency room.  (AR 293.)  On April 22, 2011, he met with Dr. Ng to follow up on the ER visit, complaining of neck pain.  (AR 284-86.)  Dr. Ng noted that his neck pain "had resolved."  (AR 284.)  Plaintiff wanted to see an orthopaedic specialist to check his right shoulder and his "chronic lower back pain."  (Id.)  Dr. Ng noted that Plaintiff was "unable to lift over [his] head" on the right side but had "no spinal tenderness."  (AR 285.)  Plaintiff reported a "9/10" pain level in his right shoulder.  (AR 287.)  Dr. Ng referred him to an orthopaedic specialist.  (AR 285.)

    On April 26, 2011, Plaintiff had x-rays of his lumbar spine and right shoulder because of his "worsening back pain" and right-shoulder pain.  (AR 309-10.)  Both revealed abnormalities (id.), but the shoulder x-ray showed "unchanged" minimal chronic degenerative joint disease when compared to an image from February 10, 2009 (AR 310, 361), and the lumbar-spine x-ray

---

    [4] Oxycodone is an opiate used to relieve moderate to severe pain.  See Oxycodone, MedLinePlus, https://medlineplus.gov/ druginfo/meds/a682132.html (last updated Aug. 15, 2016). Acetaminophen is a nonprescription pain reliever.  See Acetaminophen, MedLinePlus, https://medlineplus.gov/druginfo/ meds/a681004.html (last updated Aug. 15, 2014).

showed "[s]evere" degenerative joint disease with "marginal" osteophytosis present at L1-5, which indicated no "acute" change from an image also taken on February 10, 2009 (AR 309, 362).

On May 26, 2011, Plaintiff complained of "constant neck pain" and headaches, stating that he had hit his head on a garage door after a fall. (AR 277.) He requested referral to a specialist and stated that he had noticed memory loss. (Id.) On June 8, 2011, Plaintiff complained of "low back" and knee pain, both of which he rated as nine out of 10. (AR 275.) Dr. Ng noted that Plaintiff had "not discussed his knee pain with [her] before" and requested more history about his knees. (AR 276.) A registered nurse reviewed Plaintiff's records and informed Dr. Ng that Plaintiff was seen by an orthopaedist for knee issues and surgery in March 2007. (AR 277.)

On March 7, 2012, Plaintiff complained of right-shoulder and left-index-finger pain. (AR 249.) Dr. Ng noted that Plaintiff "had seen a lawyer" and wanted Dr. Ng to "sign to say that he cannot work as he wants to get SSI and disability." (Id.) She noted that Plaintiff had decreased range of motion in his right shoulder and swelling and tenderness in his left index finger. (AR 250-51.) For Plaintiff's back pain, Dr. Ng recommended continuing pain medication and referral to a specialist to make a functional assessment for disability purposes. (AR 251.) On March 14, 2012, Plaintiff returned to Dr. Ng, complaining of back pain. (AR 246.) On June 29, 2012, Plaintiff asked Dr. Ng to provide a note stating that his condition was "the same [as] last yr." (AR 480.)

1

b.   *Dr. Bryan H. To*

2      Dr. Bryan H. To, a consulting examiner specializing in

3   internal medicine, examined Plaintiff on July 27, 2011.  (AR 226-

4   30.)  Plaintiff reported back pain that was "getting worse," with

5   "radiation down his left leg more than [his] right leg."  (AR

6   226.)  He said his back pain was aggravated by sitting for 10

7   minutes or standing for 30 minutes.  (Id.)  Dr. To tested

8   Plaintiff's grip strength; he had slightly better grip with his

9   left, nondominant hand, but both hands had grip strength of at

10  least 110 pounds.[5]  (AR 227.)  Dr. To reported that Plaintiff

11  "ambulat[ed] with a normal gait" and did not use any assistive

12  devices.  (Id.)  Plaintiff "complain[ed] of some range of motion

13  pain during the exam"; Dr. To found that Plaintiff had decreased

14  range of motion in his back but normal range of motion in his

15  knees and other extremities.  (AR 228-29.)  Based on his

16  examination, Dr. To found that Plaintiff could push, pull, lift,

17  and carry 20 pounds occasionally and 10 pounds frequently; stand

18  and walk for six hours in an eight-hour workday; sit with no

19  restrictions; frequently walk on uneven terrain, climb ladders,

20  and work with heights; use his hands for fine and gross

21  manipulative movements without restriction; frequently bend,

22  kneel, stoop, crawl, and crouch; and hear and see with no

23  restrictions.  (AR 229-30.)  Dr. To "would restrict [Plaintiff]

24  from working with heavy and moving machineries."  (AR 230.)  He

25

26          [5] The mean grip strength for men Plaintiff's then age, 52,
27  is apparently about 114 pounds on the right and 102 on the left.
    See JAMAR Hydrolic Hand Dynamometer User Instructions (2004)
28  https://www.chponline.com/store/pdfs/j-20.pdf (last visited Nov.
    21, 2016).

reviewed two x-rays, of Plaintiff's lumbar spine and right knee. (AR 231.)   The spine x-ray showed an "old compression fracture of L1 of unknown age," "[l]evo-scoliosis,"[6] and "[s]pondylosis." (Id.)   The knee x-ray showed "well-maintained" joints and "early degenerative changes of the knee and patello-femoral joints." (Id.)

> c.   *Dr. Roger Gustafson*

On June 29, 2011, Plaintiff met with Dr. Roger Gustafson, an orthopaedic surgeon.   (AR 273-74.)   He complained of low-back pain "7/10" and "radiating numbness and tingling down [his] legs."   (AR 273.)   Dr. Gustafson noted that Plaintiff had a "normal heel/toe walk."   (Id.)   He looked at an April 1, 2009 MRI of Plaintiff's lumbar spine and found "[m]ultilevel neural foraminal stenosis," a "stable old 40% anterior compression fracture of L1," and a "6mm posterior subluxation of L1."   (AR 274.)   Dr. Gustafson noted that Plaintiff preferred to start with conservative treatment.   (Id.)   Plaintiff had an x-ray on June 29, 2011, and it was noted that his right knee had normal patellar tracking, minimal narrowing of the medial-knee-joint compartment, patella spurring, and a possible loose body.   (AR 307.)   In his left knee, he had minimal patellar spurring, minimal narrowing, and normal patellar tracking.   (Id.)   It was noted that "[n]o att[ention] [was] needed."   (Id.)

> d.   *Dr. Bradley Cole*

On July 14, 2011, Plaintiff had a consult with Dr. Bradley

---

[6] Levo-scoliosis is abnormal lateral and rotational curvature of the vertebral column on the left side.   Stedman's, supra, at 994, 1606.

Cole, a neurologist. (AR 268-70.) Plaintiff was complaining of neck pain and headaches following an accident in "late April," when he "hit his head on a garage door." (AR 268.) The neurologic examination and head CT were both normal, and Plaintiff reported that his "symptoms [were] back to baseline" and that "his headaches [were] better than they were years ago." (AR 269.) Dr. Cole found Plaintiff's gait "steady" and noted that he was "able to perform tandem gait unassisted." (Id.)

                    e.  *Dr. Stern*

On July 28, 2011, Plaintiff met with Dr. Stern, an orthopaedic specialist. (AR 267.) He reported "new" "pain in [his] right knee when he squats." (Id.) Dr. Stern found no swelling, deformity, or atrophy in Plaintiff's right knee, which had a full range of motion without pain. (Id.) He noted that Plaintiff had mild degenerative joint disease and a "possible" loose body in his right knee. (Id.) He ordered an MRI of the right knee (id.), which Plaintiff had on July 29, 2011 (AR 304). Plaintiff had 16-millimeter and 13-millimeter calcified intra-articular loose bodies and a "probable anterior cruciate ligament tear." (AR 306.) He had mild degenerative disease and small joint effusion. (Id.)

On September 1, 2011, Plaintiff complained of bilateral knee and right-shoulder pain. (AR 265.) Dr. Stern found that Plaintiff had no diminished strength, swelling, or deformity. (Id.) He had full range of motion in both knees without pain but reported "aching pain" in his right knee after the testing. (Id.) A shoulder examination found no diminished strength and no pain with "external rotation," but he had severe tenderness and

pain at "anterior-lateral aspect" of his shoulder with internal
rotation.  (Id.)  Plaintiff refused a steroid injection for his
knee but had one in his right shoulder.  (Id.)  He had an MRI on
his left knee on October 17, 2011.  (AR 302.)  It was noted that
he had a "possible oblique tear."  (AR 303.)  No fracture,
significant joint effusion, or degenerative disease were seen.
(AR 304.)

On October 11, 2012, Plaintiff contacted Dr. Stern to ask
for "a note to his attorney documenting that he cannot reach out
or work overhead without severe pain in the right shoulder."  (AR
758.)  Relying on Dr. Rusch's treatment note from May 17, 2012,
Dr. Stern wrote:

> [Plaintiff] has been followed in the Orthopedic Clinic
> for a severely painful right shoulder.  This pain is
> exacerbated by reaching out and by working overhead.

(Id.)  Plaintiff's diagnoses were "gleno-humeral arthritis" and
"acromio-clavicular joint arthritis and bursitis."  (Id.)

### f.   *Other radiology reports*

On March 25, 2012, Plaintiff had an x-ray of his right knee,
which he had recently reinjured by falling.  (AR 351.)  In
comparison with a May 17, 2007 image, there was medial
compartment narrowing amounting to no "appreciabl[e] change[],"
"mild proliferative changes," and "medial and lateral
chondrocalcinosis, which was not demonstrated on the previous
study."  (AR 352.)  A new possible loose body was identified.
(Id.)

On March 27, 2012, Plaintiff had an x-ray of his right
shoulder.  (AR 350.)  The x-ray showed moderate degenerative

change, with spurring (AR 350), from an April 22, 2011 study (AR 284-86).  There was no evidence of fracture or subluxation, and "no substantial interval changes" were found.  (Id.)

g.  *Dr. Guo*

On April 20, 2012, Plaintiff was seen by Dr. Guo, a specialist in occupational medicine, for a functional evaluation of his right shoulder and right knee.  (AR 407-10.)  Plaintiff complained of "increasing pain in the knee with accelerated development of arthritis" (AR 407), "inability to raise the shoulder over his head" (AR 408), "shooting tenderness from the anterior shoulder to the lateral elbow" (id.), and "chronic back pain due to [degenerative joint disease]" (id.).  Dr. Guo noted that Plaintiff was applying for disability and that the exam had been requested by Dr. Ng to "assist her in the [disability] process."  (Id.)  Dr. Guo examined Plaintiff and found that he had low-back pain, osteoarthrosis of the knee, and joint pain in his shoulder.  (AR 410.)  He recommended that Plaintiff not lift, pull, or push over 25 pounds; reach overhead with the right arm; squat, kneel, or crawl; climb ladders; run or jump; grasp heavy objects with the right hand; "stand[]/walk[] over 30 minutes per hour"; or bend repetitively.  (Id.)

h.  *Dr. Rusch*

On May 17, 2012, Plaintiff saw Dr. Rusch, an orthopaedic specialist.  (AR 483.)  Plaintiff reported "mild pain with rest and walking on flat surfaces" and a significant increase in pain in walking on uneven surfaces or going up stairs.  (Id.)  He also complained of right-shoulder pain at rest.  (Id.)  Dr. Rusch diagnosed "knee pain due to synovitis" and "[right] shoulder pain

due to Gleno-humeral arthritis, and subacromial bursitis and [right] A/C arthritis."  (AR 484.)

On July 19, 2012, Dr. Rusch noted that he had "reviewed [Plaintiff's] VA orthopedic record from 2009 to the present" and that "it is medically probable that the disability he currently experiences with regards to his lumbar spine, shoulders and knee existed at least 2 years ago."  (AR 477.)

### i.  *Dr. H. Robbins*

On May 23, 2012, Dr. H. Robbins,[7] a state-agency medical consultant, assessed Plaintiff's RFC on initial review.  (AR 37-42.)  Dr. Robbins opined that Plaintiff could "[s]tand and/or walk" for a total of "[a]bout 6 hours in an 8-hour workday."  (AR 38.)  He could sit for a total of "[m]ore than 6 hours on a sustained basis in an 8-hour workday."  (Id.)  Dr. Robbins noted that Plaintiff had limited overhead-reaching ability on his right side.  (AR 39.)

### j.  *Dr. Roveran*

On October 2, 2012, Dr. Roveran completed a "treating source" RFC questionnaire.  (AR 742-43.)  In the section for "[f]requency and length of contact," Dr. Roveran wrote, "[i]nformation from occupational medicine specialist report [of] Dr. Guo 4/20/12 and records review."  (AR 742.)  Dr. Roveran diagnosed Plaintiff with "low back pain," a "vertebral fracture," "[right] knee osteoarthrosis," and degenerative joint disease of the right shoulder.  (Id.)  He noted that Plaintiff could walk

---

[7] Dr. Robbins has a speciality code of "8," indicating "[e]ar, [n]ose, and [t]hroat" (AR 43); see POMS DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), http://policy.ssa.gov/poms.nsf/lnx/0424501004.

1    only one to two city blocks without rest or severe pain.  (Id.)

2    He could sit for 30 minutes "at one time . . . before needing to

3    get up" and stand "at one time" the same amount "before needing

4    to sit down, walk around, etc."  (Id.)  When asked to indicate

5    "how long [Plaintiff] can sit and stand/walk total in an 8-hour

6    working day (with normal breaks)," Dr. Roveran marked "about 4

7    hours" for both sitting and standing/walking.[8]  (Id.)  Dr.

8    Roveran noted that Plaintiff "needs to alternate sitting to

9    standing/walking due to pain."  (Id.)

10                    k.   *Dr. C. Scott*

11       On January 30, 2013, Dr. C. Scott, a state-agency medical

12   consultant, completed a case analysis upon reconsideration.  (AR

13   49-56.)  Dr. Scott considered medical evidence submitted since

14   Dr. Robbins's May 23, 2012 assessment and affirmed his findings.

15   (AR 49-50.)

16                    l.   *The VE's testimony*

17       At the 2013 hearing, the ALJ asked the VE to consider a

18   hypothetical individual "who is closely approaching advanced age,

19   with a GED . . . [restricted to] light work, occasional

20   posturals[,] . . . occasional overhead reaching bilaterally, no

21   ladders, ropes, or scaffolds or hazards, limited to unskilled

22   work with a sit/stand option every half-hour."  (AR 1057-58.)

23   The VE testified that such a person could perform three light,

24

25       [8] It appears that Dr. Roveran initially marked "less than 2
26   hours" under the "stand/walk" column.  (AR 742.)  But he marked
     and also circled the "about 4 hours" column for both "sitting"
27   and "stand/walk" and initialed the change with the notation "ERR"
     next to the "less than 2 hours" mark.  (Id.)  Thus, the Court
28   assumes he found that Plaintiff could stand or walk four hours in
     an eight-hour day.

unskilled jobs but eroded the available jobs by 75 to 90 percent primarily because of the sit-stand option.  (AR 1058.)  The VE testified that the sit-stand option would impair productivity unless the person could alternate sitting and standing at "a work site where it's bench height with a stool."  (AR 1062.)  She noted that for the job of cashier, for example, an individual would be "at a height where they can stand or they can have stools."  (Id.)  Because the hypothetical person would need a bench-height stool to sit down at will, she eroded the job base by 75 to 90 percent.  (Id.)

        3.  Analysis

The ALJ found that Plaintiff could do light work but "must be allowed to have a sit/stand option every 30 minutes."  (AR 21.)  He limited Plaintiff to "occasional overhead reaching" but put no restrictions on reaching forward or to the side.  (Id.)  In so finding, the ALJ considered but gave "little weight" to the opinions of Drs. Roveran, Rusch, and Stern and "partial weight" to the opinion of Dr. Guo.  (AR 25-26.)  He assigned "great weight" to the opinions of the state-agency medical consultants, Drs. Robbins and Scott, and to the opinion of the consultative examiner, Dr. To.  (AR 25.)  Because the opinions of Drs. Roveran, Rusch, Stern, and Guo were contradicted by other medical opinions in the record, the ALJ had to give only specific and legitimate reasons for discounting all or part of them.  See Carmickle, 533 F.3d at 1164.  As discussed below, the ALJ did so.

As an initial matter, it is not clear that all of these doctors were treating Plaintiff.  Dr. Roveran appears to have been among Plaintiff's treating doctors (see, e.g., AR 737 (Jan.

2013 radiology report ordered by Dr. Roveran), 745 (health summary listing Dr. Roveran as Plaintiff's "PCMM Provider" as of Nov. 2012), 748-49 (listing multiple visits with Dr. Roveran from July to Oct. 2012), 761-64 (note signed by Dr. Roveran describing Oct. 2012 physical exam of Plaintiff)), as does Dr. Stern (see, e.g., AR 267 (clinic-visit note by Dr. Stern describing July 2011 right-knee exam and diagnosis), 265 (Sept. 1 2011 clinic-visit note describing shoulder and knee exam, diagnosis, and treatment provided).) Dr. Rusch appears to have had a more limited relationship with Plaintiff; the record shows that Plaintiff saw him in person only once before Dr. Rusch wrote his July 19, 2012 note and only once after. (See, e.g., AR 483-84 (note signed by Dr. Rusch detailing Plaintiff's May 17, 2012 orthopaedic clinic visit), 775 (health summary noting Sept. 4, 2012 outpatient visit).) There is no evidence in the record that Dr. Guo was one of Plaintiff's treating doctors. He examined Plaintiff once, at the request of Dr. Ng. (See, e.g., AR 792-95 (Apr. 20, 2012 functional evaluation noting that Plaintiff's primary-care provider "requested [the] exam to assist her" in the disability process), 795 (follow-up note from Dr. Guo noting that Plaintiff had called about a disability form).) Even if the Court assumes all were treating doctors, the length of the treatment relationship is important in assessing whether the ALJ gave specific and legitimate reasons for rejecting each doctor's opinion to the extent he did so. See §§ 404.1527(c), 416.927(c).

a. *The sit-stand option*

Plaintiff argues that the ALJ erred in "rejecting" the opinions of Drs. Roveran, Guo, and Rusch as to Plaintiff's

standing limitations.  (J. Stip. at 6-12.)  Specifically,
Plaintiff alleges that Dr. Roveran limited his standing and
walking to "only 30 minutes at a time with a total of standing
less than two hours in a day" (J. Stip. at 5), Dr. Guo assigned
"[n]o standing/walking over 30 minutes per hour" (id.), and Dr.
Rusch opined that Plaintiff was "unable to walk on uneven
surfaces and was only able to walk for two to three blocks at a
time because of his knee disorder" (id. at 6).  In his reply,
Plaintiff appears to concede that Dr. Roveran in fact found that
he could stand four hours a day.  (See J. Stip. at 21 ("Dr.
Roveran also opined that Plaintiff would be able to . . .
stand/walk about 4 hours in an 8-hour workday[.]").)

     The ALJ's requirement of "a sit/stand option every 30
minutes," when coupled with his finding that Plaintiff could
perform light-level work with some additional limitations, is
reasonably interpreted to mean that every 30 minutes Plaintiff
must be allowed to take a short break from walking or standing
but that he could walk or stand for a total of six hours a day.
See SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983) (defining "the
full range of light work" as requiring "standing or walking, off
and on, for a total of approximately 6 hours of an 8-hour
workday"); see also Buckner-Larkin v. Astrue, 450 F. App'x 626,
627 (9th Cir. 2011) (court using information from record to
interpret intended meaning of sit-stand option); cf. SSR 83-12,
1983 WL 31253, at *4 (Jan. 1, 1983) (describing, under heading
"[a]lternate [s]itting and [s]tanding," an individual who "may be
able to sit for a time, but must then get up and stand or walk
for awhile before returning to sitting").  Interpreted this way,

the ALJ's sit-stand option appears to be inconsistent with the medical-opinion evidence, which generally limits Plaintiff to four hours of standing a day.  (See, e.g., AR 742 (Dr. Roveran limiting Plaintiff to four hours of daily standing), 410 (Dr. Guo limiting Plaintiff to no more than 30 minutes of standing an hour); see also J. Stip at 13 (Defendant conceding that Plaintiff was limited to four hours of standing a day).)  As explained below, however, any error was harmless.

     The VE interpreted the ALJ's sit-stand option to mean that Plaintiff had to be able to sit or stand "at will."  Indeed, the VE's primary reason for eroding the available jobs by 75 to 90 percent was Plaintiff's need to be "at a bench height with a stool."  (AR 1062.)  She noted that "alternating sitting and standing would have to be at a work site where it's bench height with a stool" because "[o]therwise, it's going to impair productivity."  (Id.)  Thus, the VE contemplated a sit-stand option not just allowing the individual to stand or sit briefly every 30 minutes but one in which the individual could choose to sit or stand at will throughout the workday, remaining generally at "bench height" so as not to impair productivity.

     Because the "at will" sit-stand option considered by the VE to determine the job base accommodated a limit to no more than four hours of standing a day, any error was harmless.  See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes harmless); cf. Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 536 (6th Cir. 2001) (finding harmless error when ALJ did not discuss opinion of treating physician but VE took relevant limitations into consideration

anyway).   Thus, the ALJ's finding that Plaintiff could perform the three jobs listed by the VE adequately took into account Plaintiff's limitation of four hours of standing a day as well as the specific limits imposed by Drs. Roveran, Guo, and Rusch. Moreover, as explained below, the ALJ's RFC finding — with a sit-stand option interpreted as the VE and Commissioner have done — was fully supported by the record.

    To the extent the ALJ rejected any portions of the opinions of Drs. Roveran, Guo, and Rusch, he gave legally sufficient reasons for doing so.[9]   First, the ALJ gave "little weight" to the opinions of Drs. Rusch and Roveran and "partial weight" to the opinion of Dr. Guo because they were inconsistent with the medical record and unsupported by diagnostic evidence.   (AR 25.) Dr. Roveran opined that Plaintiff could walk only one or two city blocks without rest or severe pain.   (AR 742.)   This opinion was apparently largely based on Dr. Guo's report and a review of Plaintiff's medical records.   (Id.)   In his report, Dr. Guo opined only that Plaintiff could not stand or walk "over 30 minutes per hour."   (AR 410.)   In his brief note, Dr. Rusch opined "that it is medically probable that the disability [Plaintiff] currently experiences with regards to his lumbar spine, shoulders and knee" had existed for at least two years. (AR 477.)

    The other medical evidence in the record, however, shows

---

[9] As Defendant points out, the sit-stand option assessed by the ALJ is largely consistent with the standing and walking limitations assessed by Drs. Roveran and Guo.   (J. Stip. at 13, 19.)   Both opined that Plaintiff could stand or walk about four hours in an eight-hour workday, which was the same limitation applied by the VE.   (See supra, Section V(A)(3)(a).)

that Plaintiff had a normal gait and could stand for six hours a
day.  Dr. To reported that Plaintiff "ambulat[ed] with a normal
gait," did not use any assistive devices (AR 227), and could
"stand and walk for six hours in an eight-hour workday" and
"frequently walk on uneven terrain" (AR 230).  Dr. Gustafson
found that Plaintiff had a "normal heel/toe walk" (AR 273); Dr.
Cole noted that Plaintiff's gait was "steady" and he was "able to
perform tandem gait unassisted" (AR 269).  Drs. Scott and Robbins
agreed with Dr. To's finding that he could walk "about" six hours
a day.  (AR 38-39, 52.)

Inconsistency with the medical record and lack of diagnostic
evidence are permissible reasons for the ALJ to give portions of
the opinions of Drs. Roveran, Guo, and Rusch little weight.  See
Batson, 359 F.3d at 1195 (ALJ may discredit treating physicians'
opinions that are "unsupported by the record as a whole");
Thomas, 278 F.3d at 957 (ALJ need not accept treating-physician
opinion that is "inadequately supported by clinical findings");
cf. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source
presents relevant evidence to support an opinion, particularly
medical signs and laboratory findings, the more weight we will
give that opinion.").

Second, to the limited extent these opinions were more
restrictive than Plaintiff's RFC, the ALJ gave them "little
weight" because they were inconsistent with Plaintiff's "admitted
activities of daily living."  (AR 25.)  The ALJ noted that
Plaintiff "lived alone, drove, ran errands, shopped, cooked,
performed personal care tasks, and read."  (Id.)  The ALJ noted
that the more restrictive findings — the limit to walking one or

22

two blocks at a time, for example — were contradicted by some of these admitted activities of daily living, including regularly running errands and shopping.  This is a specific and legitimate reason to disregard the medical opinions that Plaintiff had more restrictive limitations than his assessed RFC.  See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ's finding that doctor's "restrictions appear to be inconsistent with [plaintiff's] level of activity" was specific and legitimate reason for discounting opinion); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 601-02 (9th Cir. 1999) (ALJ permissibly rejected treating physician's opinion when it conflicted with plaintiff's activities); see also Fisher v. Astrue, 429 F. App'x 649, 652 (9th Cir. 2011) (conflict between doctor's opinion and claimant's daily activities was specific and legitimate reason to discount opinion).

Finally, the ALJ gave "great weight" to the opinions of Drs. Robbins, Scott, and To because those opinions were consistent with the diagnostic evidence and other medical evidence in the record.  (AR 25.)  Because Dr. To examined Plaintiff, his opinion alone can be substantial evidence for the ALJ to rely on.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

Plaintiff argues that the ALJ erred in giving great weight to the opinion of Dr. To because his condition worsened after Dr. To's July 2011 examination.  But this claim is not supported by the medical evidence or by Plaintiff's subjective complaints.  For example, on June 29, 2012, he told Dr. Ng that his "condition" was "the same [as] last [year]."  (AR 480.)  Further,

as discussed in more detail below, despite his testimony at the
hearing to the contrary, Plaintiff's subjective assessment of his
pain did not increase from 2011 to 2013 — rather, it fluctuated
between "8/10" and "9/10" (see, e.g., AR 477, 516), and Plaintiff
consistently reported that his pain reduced to "5/10" when he
used medication (see, e.g., AR 77, 262; see also infra, Section
V(B)(2) (describing Plaintiff's subjective ratings of pain
between 2011 and 2013)).[10]

Plaintiff also argues that because (as Defendant concedes)
he can stand only up to four hours a day, he was "entitled to
disability" with application of the "sedentary" grid and that the
ALJ erred in not so finding. (See J. Stip. at 21-22.)  If the
grids do not "completely and accurately represent a claimant's
limitations," however, reliance on them is not appropriate and a
vocational expert's testimony is warranted.  Tackett, 180 F.3d at
1101-02 (emphasis omitted).  The ALJ therefore properly consulted
a VE to determine whether any available light-work jobs would
adequately accommodate Plaintiff's specific limitations.  See SSR
83-12, 1983 WL 31253, at *2 (noting that when individual's
exertional RFC does not coincide with any of defined ranges of
work but instead includes "considerably greater restriction(s),"
VE testimony can clarify extent of erosion of occupational base);
Moore v. Apfel, 216 F.3d 864, 870 (9th Cir. 2000) ("SSR 83-12
directs that when a claimant falls between two grids,
consultation with a VE is appropriate."); Thomas, 278 F.3d at 960

---

[10] Also, because Plaintiff's date last insured was March 31,
2011 (see AR 17), for at least DIB purposes Dr. To's assessment,
dated July 2011, was more relevant than subsequent medical
reports, including those from 2012.

(same).

The VE applied a sit-stand option to the light-work jobs, accommodating Plaintiff's limitations as found by the ALJ and noting appropriate levels of erosion in the job base.  (AR 1058.) The ALJ was entitled to rely on the VE's informed, specific, and uncontradicted explanation that consistent with his RFC for a limited range of light work, Plaintiff was able to work as a cashier II, small-products assembler II, and bench assembler. See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) ("A VE's recognized expertise provides the necessary foundation for his or her testimony.").  Accordingly, the ALJ did not err.

### b.   *Reaching limitations*

Plaintiff argues that the ALJ also erred in not including any forward- or side-reaching limitations in his RFC.  (J. Stip. at 22-26.)  Specifically, he argues that the ALJ should have credited Dr. Stern's 2012 note stating that Plaintiff's pain was "exacerbated by reaching out and working overhead."  (AR 758.)

Dr. Stern apparently wrote the note for Plaintiff at his request after not having treated him for a year.  (Compare AR 265 (Dr. Stern's last treatment note, from Plaintiff's Sept. 1, 2011 clinic visit), with AR 758 (Plaintiff's Oct. 2012 request for note from Dr. Stern).)  The ALJ gave "little weight" to the note because it was not supported by the medical evidence.  Indeed, most of the medical records before and after Dr. Stern wrote his October 11, 2012 note do not support such a limitation.  (See, e.g., AR 228-29 (July 2011: Dr. To noting normal range of motion and normal motor function in all extremities), 898 (Dec. 2013: "[f]ull active ROM" and "5/5" shoulder-rotation muscle strength

noted).)

Plaintiff consistently complained to doctors that he was "unable to lift over [his] head" on the right side (see, e.g., AR 285, 408) but did not complain of pain reaching forward or to the side.  Drs. Guo and Robbins mentioned Plaintiff's overhead restrictions but did not cite any limitations in reaching forward or to the side.  (See AR 39, 410.)  Dr. To found that Plaintiff had normal range of motion in all extremities; could push, pull, lift, and carry 20 pounds occasionally and 10 pounds frequently; and could even climb ladders.  (AR 228-30.)  As the ALJ noted (AR 26), even Dr. Stern's own treatment notes do not support the limitation.  He reported in September 2011 that Plaintiff had "no pain" with "external rotation" of his shoulder, which presumably would include reaching forward and to the side.[11]  (AR 265.)

Further, nothing indicates that Plaintiff's shoulder condition deteriorated after his assessment by Dr. To in 2011, as Plaintiff alleges.  (See J. Stip. at 11-12.)  Indeed, on June 29, 2012, he told Dr. Ng that his "condition" was "the same [as] last [year]" (AR 480), and he described consistent levels of pain from 2011 to 2012 (see infra, Section V(B)(2)).  Inconsistency with the medical evidence was a permissible reason for the ALJ to give Dr. Stern's opinion little weight.  See Batson, 359 F.3d at 1195

_____

[11] External rotation of the shoulder is evaluated in part by asking patients to reach forward, keeping their elbow bent at 90 degrees, and rotate their arm outward.  See A Practical Guide to Clinical Medicine, Univ. of Cal., San Diego, https://meded.ucsd.edu/clinicalmed/joints2.htm (last updated Feb. 10, 2011).  Internal rotation is evaluated by asking patients to place their hand behind their back and reach as high up the spine as possible.  Id.  External rotation, then, involves reaching both forward and to the side.

1  (ALJ may discredit treating physicians' opinions that are
2  "unsupported by the record as a whole"); Thomas, 278 F.3d at 957
3  (ALJ need not accept treating-physician opinion that is
4  "inadequately supported by clinical findings").

5       B.   The ALJ Properly Assessed Plaintiff's Credibility

6       Plaintiff argues that the ALJ failed to articulate legally
7  sufficient reasons for rejecting his testimony. (J. Stip. at
8  31.) For the reasons discussed below, the ALJ did not err.

9            1.   Applicable law

10      An ALJ's assessment of symptom severity and claimant
11 credibility is entitled to "great weight." See Weetman v.
12 Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779
13 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to
14 believe every allegation of disabling pain, or else disability
15 benefits would be available for the asking, a result plainly
16 contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674
17 F.3d 1104, 1112 (9th Cir. 2012) (citing Fair v. Bowen, 885 F.2d
18 597, 603 (9th Cir. 1989)).

19      In evaluating a claimant's subjective symptom testimony, the
20 ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d
21 at 1035-36. "First, the ALJ must determine whether the claimant
22 has presented objective medical evidence of an underlying
23 impairment [that] could reasonably be expected to produce the
24 pain or other symptoms alleged." Id. at 1036. If such objective
25 medical evidence exists, the ALJ may not reject a claimant's
26 testimony "simply because there is no showing that the impairment
27 can reasonably produce the degree of symptom alleged." Smolen,
28 80 F.3d at 1282 (emphasis in original).

1    If the claimant meets the first test, the ALJ may discredit

2    the claimant's subjective symptom testimony only if he makes

3    specific findings that support the conclusion.  See Berry v.

4    Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or

5    affirmative evidence of malingering, the ALJ must provide "clear

6    and convincing" reasons for rejecting the claimant's testimony.

7    Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as

8    amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090,

9    1102 (9th Cir. 2014).  The ALJ may consider, among other factors,

10   (1) ordinary techniques of credibility evaluation, such as the

11   claimant's reputation for lying, prior inconsistent statements,

12   and other testimony by the claimant that appears less than

13   candid; (2) unexplained or inadequately explained failure to seek

14   treatment or to follow a prescribed course of treatment; (3) the

15   claimant's daily activities; (4) the claimant's work record; and

16   (5) testimony from physicians and third parties.  Rounds v.

17   Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as

18   amended); Thomas, 278 F.3d at 958-59.  If the ALJ's credibility

19   finding is supported by substantial evidence in the record, the

20   reviewing court "may not engage in second-guessing."  Thomas, 278

21   F.3d at 959.

22          2.   Relevant background

23     Plaintiff reported consistent levels of pain — between

24   "8/10" and "9/10" without medication and "4/10" and "5/10" with

25   it — in his lower back, right shoulder, and knees from 2011 to

26   2012.  (See, e.g., AR 516 (Aug. 15, 2011: pain in back "9/10"),

27   262 (Sept. 15, 2011: pain in low back "8/10," shoulder "5/10,"

28   and knees "5/10"), 261 (Oct. 17, 2011: "9/10" pain in lower back,

28

shoulder, and knees), 259 (Nov. 15, 2011: "9/10" pain in lower back, "5/10" pain in knees), 258 (Dec. 8, 2011: "8/10" pain in lower back and knees, reduced to "4/10" with medication), 254-55 (Jan. 9 & Feb. 14, 2012: "8/10" pain in "low back" and knees), 481 (May 24, 2012: pain "8/10" in low back, knee, shoulder), 477 (July 19, 2012: "8/10" pain in back and shoulder), 756 (Oct. 16, 2012: pain in back "8/10" without medication, "5/10" with medication), 771 (Sept. 20, 2012: pain in back "5/10" with medication, "8/10" without).) On January 11, 2013, Plaintiff reported "persistent pain" in his lower back. (AR 973.) He rated the pain as "10" and stated that it was "so bad [he could] hardly breath[e]." (Id.) He could not lift over his head. (Id.)

In a March 22, 2012 exertion questionnaire, Plaintiff noted that he could walk "for about 5 to 10 min. slowly" before needing to stop. (AR 178.) Basic cleaning was "hard and difficult," but he was able to do things "in moderation and slowly." (Id.) He was able to go shopping one or two times a week but could only drive for about 10 minutes before experiencing intolerable back and shoulder pain. (AR 179.) He was able to dress himself, but with "a lot of difficulty [and] pain." (AR 178.) He did not work on cars or do yard work. (AR 179.)

At the January 29, 2013 hearing, Plaintiff testified that he was "in considerable pain, whether . . . standing or sitting." (AR 1037.) Standing "beyond 20 minutes to a half hour" at a time was "unbearable to the point [he] need[ed] to sit." (Id.) But sitting also caused him "considerable pain." (Id.) He testified that he could sit for only "a half hour" before having to change

position.  (AR 1038.)  Raising his right arm caused "considerable aching."  (Id.)  He had pain in his knees, especially the right one.  (AR 1039-40.)  He took ibuprofen, oxycodone, morphine, morphine sulfate, and lidocaine for his pain.  (AR 1040.)  He was able to keep his house clean, cook, and shop.  (AR 1041-42.)  He had difficulty "shampooing" with his right arm.  (AR 1042.)  His lower back hurt when he bent over.  (Id.)  He "frequently" used his recliner chair and drove his car "a few times a day."  (AR 1043.)  He testified that he had "difficulty just with ordinary tasks throughout the day" and was in "constant pain."  (AR 1045.)  He noted that his back pain had "increased considerably" in the last two years.  (Id.)  He worked for a friend for two days in 2010 but "couldn't even complete the job because of my shoulder."  (AR 1050.)  He noted, however, that his shoulder pain in 2010 was "pretty much the same" as it was at the time of the hearing.  (Id.)  He testified that he would have difficulty lifting a gallon of milk past a certain point[12] and that he would have issues lifting 20 pounds from the floor up to a table because of his knee and back pain.  (Id.)

In early 2013 Plaintiff reported levels of pain similar to those of 2011 and 2012.  (See, e.g., AR 963 (Apr. 30, 2013: pain in lower back "9/10" without medication, "5/10" with medication), 951 (May 28, 2013: pain in lower back "8/10" without medication, "6/10" with medication).)  In November 2013 Plaintiff reported that he had been "working on [a] car engine," which aggravated

---

[12] A gallon of milk weighs approximately eight pounds.  See Hernandez v. Colvin, No. 1:12-CV-00330-SMS, 2013 WL 4041862, at *9 n.4 (E.D. Cal. Aug. 8, 2013).

his shoulder pain.  (AR 925.)  He requested pain injections in both shoulders (AR 929) but declined rotator-cuff surgery (AR 925).  The pain was in his left arm and increased with movement.  (AR 930.)  He reported it as "6/10."  (AR 932.)

### 3. <u>Analysis</u>

The ALJ found Plaintiff "partially credible."  (AR 22.)  But he discredited some of Plaintiff's complaints, finding that although his "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of [those] symptoms" were not credible to the extent they were inconsistent with his RFC.  (<u>Id.</u>)  As discussed below, to the extent the ALJ rejected Plaintiff's subjective complaints, he provided clear and convincing reasons for doing so.

First, the ALJ found that Plaintiff's "activities of daily living" were inconsistent with his statements about his disability and "demonstrate[d] [his] capacity for work."  (<u>Id.</u>)  At the hearing, Plaintiff testified that he was able to keep his house clean, cook, and shop as necessary.  (AR 1041-42.)  He worked on his car in 2013 (AR 925) despite stating in 2012 that he was unable to do so (AR 179).  Keeping a house clean, shopping once or twice a week, driving, and working on a car are inconsistent with Plaintiff's allegation that he was unable to reach forward or to the side, for example.  (AR 758, 1039.)  An ALJ may properly discount a plaintiff's credibility when his daily activities are inconsistent with his subjective symptom testimony.  <u>See</u> <u>Molina</u>, 674 F.3d at 1112 (ALJ may discredit claimant's testimony when "claimant engages in daily activities

inconsistent with the alleged symptoms" (citing <u>Lingenfelter</u>, 504 F.3d at 1040)).  "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  <u>Molina</u>, 674 F.3d at 1113.

Second, the ALJ found that Plaintiff's testimony about his daily activities and "statements concerning his capacity to walk" were "inconsistent with statements from examining physicians" and the medical evidence in the record.  (AR 22.)  Indeed, as discussed in detail above, Plaintiff's alleged inability to walk in excess of his assessed RFC and his alleged restrictions on reaching forward or to the side are not supported by the medical record.  Further, Plaintiff testified on January 29, 2013, that his pain had "increased considerably" during the past two years, but his own statements to various doctors from 2011 to 2013 showed a stable, if not decreasing, level of pain.  (<u>See</u> <u>supra</u>, Section V(B)(2) (describing Plaintiff's subjective rating of pain).)  Inconsistency between Plaintiff's testimony and the medical evidence was a permissible reason to discount his subjective complaints.  <u>See</u> <u>Thomas</u>, 278 F.3d at 958-59 (in assessing credibility, ALJ may consider inconsistencies either in claimant's testimony or between testimony and conduct).

Finally, the ALJ noted that the objective evidence supporting Plaintiff's subjective claims of symptom severity was "meager."  (AR 23.)  Indeed, other than Dr. Stern's 2012 note, which appears to have been based at least in part on Plaintiff's subjective complaints, there is no evidence in the medical record

that Plaintiff had any limitations reaching forward or to the side.  The ALJ was entitled to consider the lack of objective medical evidence as one factor in assessing Plaintiff's subjective complaints and credibility.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.").

In sum, the ALJ provided clear and convincing reasons for finding Plaintiff only partially credible.  Because those findings were supported by substantial evidence, this Court may not engage in second-guessing.  See Thomas, 278 F.3d at 959.  Plaintiff is not entitled to remand on this ground.

C.   Plaintiff's Significant-Erosion Argument Under
     POMS Lacks Merit

Plaintiff argues that the VE's exclusion of 75 percent of the total available cashier II jobs and 90 percent of the small-products assembler II and bench assembler jobs caused a "significant" erosion of the occupational base, necessitating application of the "sedentary grid rule" under POMS.  (J. Stip. at 39.)  As discussed below, remand is not warranted on this ground.

1.   Applicable law

Jobs are classified as "sedentary, light, medium, heavy, and very heavy" according to their "physical exertion requirements." §§ 404.1567, 416.967.  "Sedentary work" generally involves

lifting no more than 10 pounds at a time, with occasional lifting or carrying of small objects and articles, and predominantly features sitting, with walking or standing "required occasionally." §§ 404.1567(a), 416.967(a). Social Security Ruling 83-10 further explains that "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5 (describing requirements for "full range" of sedentary work).

"Light work" generally involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," though "the weight lifted may be very little." §§ 404.1567(b), 416.967(b); see SSR 83-10, 1983 WL 31251, at *5. Light work "requires a good deal of walking or standing, or . . . involves sitting most of the time but with some pushing and pulling of arm or leg controls." §§ 404.1567(b), 416.967(b); see SSR 83-10, 1983 WL 31251, at *5. "To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." §§ 404.1567(b), 416.967(b).

At step five of the five-step process, the Commissioner has the burden to demonstrate that the claimant can perform some work that exists in "significant numbers" in the national or regional economy, taking into account the claimant's RFC, age, education, and work experience. Tackett v. Apfel, 180 F.3d 1094, 1100 (9th Cir. 1999); see 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1560(c), 416.960(c). The Commissioner may satisfy that

34

1  burden either through the testimony of a VE or by reference to

2  the grids.  Tackett, 180 F.3d at 1100-01.

3        The DOT "is not the sole source of admissible information

4  concerning jobs," and the ALJ "may take administrative notice of

5  any reliable job information, including the services of a

6  vocational expert."  Johnson v. Shalala, 60 F.3d 1428, 1435 (9th

7  Cir. 1995) (alteration and citations omitted).  The DOT "lists

8  maximum requirements of occupations as generally performed, not

9  the range of requirements of a particular job as it is performed

10 in specific settings," and a VE "may be able to provide more

11 specific information about jobs or occupations than the DOT."

12 SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).  "A VE's

13 recognized expertise provides the necessary foundation for his or

14 her testimony," and "no additional foundation is required."

15 Bayliss, 427 F.3d at 1218.

16            2.  Relevant background

17       The ALJ asked the VE to consider a hypothetical individual

18 "who is closely approaching advanced age, with a GED," who could

19 perform "light work, occasional posturals[,] . . . occasional

20 overhead reaching bilaterally, no ladders, ropes or scaffolds or

21 hazards, limited to unskilled work with a sit/stand option every

22 half-hour."  (AR 1057-58.)  The VE testified that such a

23 hypothetical individual could perform three jobs in the regional

24 and national economy: "small products assembler II," "cashier

25 II," and "bench assembler."  (AR 1058.)  Taking into account the

26 sit-stand option, the VE eroded the "small products assembler II"

27 job by 90 percent, which "would leave 900 positions regionally

28 and 8,000 nationally."  (Id.)  She eroded the "cashier II" job by

35

1   75 percent, leaving "1,125 positions regionally and 25,000
2   nationally." (Id.)  She applied a 90 percent erosion to the
3   "bench assembler" job, leaving "250 jobs regionally and 4,000
4   nationally." (Id.)

5        3.   Analysis

6        As an initial matter, Plaintiff misplaces his reliance on
7   POMS DI 25001.001.B.72, available at https://secure.ssa.gov/
8   poms.NSF/lnx/0425001001, which is a "Quick Reference Guide"
9   defining, among other terms, "[s]ignificant erosion" as "[a]
10  considerable reduction in the available occupations at a
11  particular exertional level."  It indicates that in such
12  circumstances, an ALJ should generally "use a lower exertional
13  rule as a framework for a decision."  See id.

14       Notably, POMS is an internal agency manual that "does not
15  have the force of law," Warre v. Comm'r of Soc. Sec. Admin., 439
16  F.3d 1001, 1005 (9th Cir. 2006), and is binding on neither the
17  ALJ nor the Court, see Lockwood v. Comm'r Soc. Sec. Admin., 616
18  F.3d 1068, 1073 (9th Cir. 2010) ("POMS constitutes an agency
19  interpretation that does not impose judicially enforceable duties
20  on either this court or the ALJ.").  Moreover, "even if POMS had
21  the force and effect of law, POMS DI 25001.001 ¶ B.71[13] does not
22  mandate the ALJ to use a lower exertional rule level";
23  "[i]nstead, it merely suggests using a lower exertional rule as a
24  framework if there is a 'considerable reduction in the available
25  occupations at a particular exertional level.'"  Durden v.
26  Astrue, No. CV 11-1211-SP, 2012 WL 682880, at *3 (C.D. Cal. Mar.

27  _____

28       [13] Apparently former subsection B.71 was subsequently
    renumbered as B.72.

1  2, 2012) (citation omitted), <u>aff'd</u>, 546 F. App'x 690 (9th Cir.

2  2013).  Thus, the ALJ was free not to apply POMS subsection B.72.

3       Here, application of subsection B.72 was not warranted

4  because there remained a significant number of available light-

5  exertional occupations identified by the VE after she had eroded

6  them.[14]  A 75 percent reduction in available cashier II jobs

7  still left 25,000 such jobs available in the national economy; a

8  90 percent reduction in bench-assembler jobs left 4000 such jobs

9  nationally; a 90 percent reduction in small-products-assembler II

10 positions left 8000 such jobs nationally.  (AR 1058.)  The 75 to

11 90 percent erosion applied by the VE left 37,000 jobs available

12 in the national economy.  That is a significant number of jobs.

13 <u>See</u> <u>Gutierrez v. Comm'r of Soc. Sec.</u>, 740 F.3d 519, 528-29 (9th

14 Cir. 2014) (holding that 25,000 nationally available jobs

15 presented a "close call" but nonetheless sufficed as "work which

16 exists in significant numbers").  Accordingly, the concerns

17 animating POMS B.72 were not present here.

18      Plaintiff also argues that the ALJ "could only name" three

19 positions he could perform and that "[t]he full range of light

20 work is surely eroded significantly when only three jobs eroded

21 by 75 [percent] and 90 [percent] is all that is left of the

22 vocational base."  (J. Stip. at 41.)  In fact, the ALJ said that

23 the three light occupations the VE identified were merely

24 "representative" of occupations in the national economy that

25 ─────────────────

26    [14] Plaintiff relies on <u>Distasio v. Shalala</u>, 47 F.3d 348 (9th
   Cir. 1995), to argue that the ALJ should have applied the
27 sedentary grid rule.  As Defendant correctly points out, however,
   in <u>Distasio</u> the VE expressly limited the claimant to sedentary
28 work.  <u>Id.</u> at 349-50.  Here, the VE identified three light-work
   jobs Plaintiff was capable of performing.

1  Plaintiff could perform.[15]   (AR 28.)   In any event, even just one

2  occupation suffices as long as it provides a significant number

3  of jobs. See Tommasetti v. Astrue, 533 F.3d 1035, 1043-44 (9th

4  Cir. 2008) (holding that VE's testimony describing single

5  occupation for which significant number of jobs existed

6  sufficed); Tamayo v. Colvin, No. CV 12-8484 JCG, 2013 WL 5651420,

7  at *2 (C.D. Cal. Oct. 11, 2013) (finding one occupation

8  sufficient "as long as [it] still has a significant number of

9  positions that exist in the national economy" (citation

10 omitted)).

11      The ALJ did not err in not applying the sedentary grid rule.

12      D.    Substantial Evidence Supported the ALJ's Determination

13            that Plaintiff Could Perform the Representative Light-

14            Exertion Jobs[16]

15      Plaintiff also argues that the ALJ's nondisability finding

16 was "not supported by substantial evidence because it cannot be

17 determined whether [Plaintiff] would be performing the jobs (with

18 the sit-stand option and no lifting identified) in a sedentary

19 manner." (J. Stip. at 45.)   Plaintiff claims that the ALJ should

20 have further developed the record to determine "whether the jobs

21 named retained the lifting requirements of light work." (Id. at

22 42.)   Plaintiff states that the VE "offered no testimony as to

23 what actual lifting would be required" in the three jobs listed,

24

25      [15] Indeed, no rule requires the VE to list all or even
   substantially all occupations a claimant can do.  Given that the
26 DOT includes thousands of occupations, any such rule would
   overwhelm the Agency and grind disability proceedings to a halt.

27

28      [16] Plaintiff included this argument in his section on
   significant erosion.  (See J. Stip. at 42, 45-46.)  For clarity,
   the Court has separated it out into its own section.

1  and the ALJ failed to "establish . . . whether these three jobs
2  are actually being performed in a light manner."  (Id.)

3      Plaintiff's RFC was reduced light work with limitations on
4  postural activities and overhead reaching; no climbing; and a
5  sit-stand option every 30 minutes.  (AR 21.)  If the grids do not
6  "completely and accurately represent a claimant's limitations,"
7  reliance on them is not appropriate and vocational-expert
8  testimony is necessary.  Tackett, 180 F.3d at 1101-02 (emphasis
9  omitted).  The ALJ therefore properly consulted the VE to
10 determine whether any available light-work jobs would adequately
11 accommodate Plaintiff's specific limitations.  See SSR 83-12,
12 1983 WL 31253, at *2 (noting that when individual's exertional
13 RFC does not coincide with any of defined ranges of work but
14 instead includes "considerably greater restriction(s)," VE
15 testimony can clarify extent of erosion of occupational base);
16 Moore, 216 F.3d at 870; Thomas, 278 F.3d at 960.

17     Substantial evidence supported the ALJ's finding that
18 Plaintiff could perform the lifting requirements of the three
19 jobs identified by the VE.  The ALJ asked the VE, "What if the
20 lifting or carrying on the right side is limited to 10 pounds
21 rather than 10-20?"  (AR 1059.)  The VE responded, "That would
22 not impact cashier II . . . [but] there could be further erosion
23 on the assembly positions, so another [five] percent."  (Id.)
24 The ALJ's question and the VE's answer demonstrate that both
25 understood that the three jobs listed retained the normal lifting
26 limitations of light work.  See §§ 404.1567(b), 416.967(b)
27 ("Light work involves lifting no more than 20 pounds at a time
28 with frequent lifting or carrying of objects weighing up to 10

pounds.").  The ALJ amended his hypothetical to the VE to account for a potential lifting and carrying limitation on Plaintiff's right side.  (AR 1059.)  The VE applied the amendment to her previous erosion analysis for each job and concluded that it would not affect the cashier II job and might erode the other two jobs by a further five percent.  (Id.)  Ultimately, the ALJ did not include this limitation in Plaintiff's RFC, a finding he has not challenged.  No doctor opined that Plaintiff could not lift 20 pounds or frequently lift and carry up to 10 pounds.

The ALJ was entitled to rely on the VE's informed, specific, and uncontradicted explanation that consistent with his RFC for a limited range of light work, Plaintiff was able to work as a cashier II, small-products assembler II, and bench assembler. See Bayliss, 427 F.3d at 1218.  Accordingly, remand is not warranted on this basis.

**VI.   CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[17] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: 12/5/2016

                                    JEAN ROSENBLUTH
                                    U.S. Magistrate Judge

---

[17] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."